*CJP Supp. 182 Opinion
HORN, Chairperson.
I. INTRODUCTION AND SUMMARY
This disciplinary matter concerns Judge José A. Velasquez of the Monterey County Superior Court. On April 25, 2006, the commission filed a notice of formal proceedings against Judge Velasquez in which it charges Judge Velasquez with the following misconduct:
Count I charges that in eight criminal cases Judge Velasquez violated the probation of unrepresented defendants who appeared to request a modification of probation and imposed time in custody without complying with minimal due process requirements, including notice and a formal hearing.
Count II charges that in six criminal cases Judge Velasquez improperly increased or threatened to increase the defendant’s sentence for asking legitimate questions regarding his or her sentence or offering a defense.
Count III charges that in five criminal cases Judge Velasquez asked defendants convicted of misdemeanor exhibition of speed if it felt good to “peel out” and improperly conditioned their sentence on the response given. Judge Velasquez is charged with having predetermined that there was only one truthful answer based on his personal experience.
*CJP Supp. 183 Count IV charges that in seven criminal cases Judge Velasquez informed unrepresented defendants at arraignment that their only choices were to plead guilty or accept diversion, which required they attend Alcoholics Anonymous (AA) meetings, without advising the defendants of their constitutional right to plead not guilty and have a trial.
Count V charges Judge Velasquez with improperly issuing bench warrants for absent defendants (whose absence had been excused pursuant to Pen. Code, § 977) because the defense attorney was not present when the case was called; refusing to recall the warrant when the attorney later appeared and explained his or her absence; and, in one case, after knowing that he had been disqualified pursuant to Code of Civil Procedure section 170.6, ordering an attorney to produce the letters he had filed with another judge regarding the disqualification.
Count VI charges Judge Velasquez with making inappropriate comments in 14 instances that disparaged counsel, or suggested, as a “joke,” that a.person appearing before him was about to be remanded to custody.
Count VII charges Judge Velasquez with improperly allowing his children in the bench area while court was in session and in chambers during case discussions.
The Supreme Court appointed three special masters who held an evidentiary hearing and reported to the commission. The masters are Justice Laurence D. Rubin of the Court of Appeal, Second Appellate District, Division Eight, Judge Kevin M. McCarthy of the San Francisco County Superior Court, and Judge Eleanor Provost of the Tuolumne County Superior Court. The hearing before the masters took place in San Jose over three days commencing August 21, 2006, followed by oral argument before them on November 3, 2006. The masters presented their report to the commission on December 22, 2006.
The factual findings of the masters are largely undisputed. Although Judge Velasquez objects to some of the masters’ legal conclusions, he concedes numerous incidents of serious misconduct. Judge Velasquez also concedes that he has engaged in prior misconduct resulting in a censure in 1997, the second most serious form of discipline available to the commission, and in an advisory letter in 2006. Nevertheless, Judge Velasquez contends that he should not be removed. We disagree and order Judge Velasquez removed from office.
Judge Velasquez has engaged in an egregious pattern of misconduct that infringed the constitutional rights of numerous defendants and transgressed the limits of his authority, often in a capricious and malicious *CJP Supp. 184 manner. The masters concluded as do we that “Judge Velasquez incarcerated several defendants without respect for their constitutional rights; he showed irritation when defendants asked him straightforward and respectful questions about their sentences; he coerced defendants into attending AA meetings; he expressed his unhappiness with attorneys by not recalling warrants for the arrest of their clients and by making disparaging remarks; and he used humor inappropriately at the expense of persons whose constitutional rights he has sworn to uphold.” These incidents are not isolated; rather, they reflect a disturbing and persistent pattern of conduct that is completely at odds with the standard of conduct expected of the judiciary.
Judge Velasquez presented evidence in mitigation of his conduct, mostly in the form of testimony and declarations from character witnesses. However, the image portrayed of Judge Velasquez as a respected member of the community and role model outside the courtroom stands in sharp contrast to his egregious pattern of past and present misconduct in the courtroom. The breadth and seriousness of the judge’s present and past misconduct overwhelms other considerations and compels our conclusion that removal is required.
Judge Velasquez is represented by James A. Murphy and Harlan B. Watkins, of San Francisco. The examiners for the commission are Trial Counsel Jack Coyle and Assistant Trial Counsel Valerie Marchant.
H. GENERALLY APPLICABLE LEGAL PRINCIPLES
A. Burden of Proof
The commission has the burden of proving the charges against Judge Velasquez by clear and convincing evidence. (Doan v. Commission on Judicial Performance (1995) 11 Cal.4th 294, 313 [45 Cal.Rptr.2d 254, 902 P.2d 272]; Geiler v. Commission on Judicial Qualifications (1973) 10 Cal.3d 270, 275 [110 Cal.Rptr. 201, 515 P.2d 1].) “Evidence of a charge is clear and convincing so long as there is a ‘high probability’ that the charge is true. [Citations.] The evidence need not establish the fact beyond a reasonable doubt.” (Broadman v. Commission on Judicial Performance (1998) 18 Cal.4th 1079, 1090 [77 Cal.Rptr.2d 408, 959 P2d 715] (Broadman).)
B. Levels of Misconduct
The levels or types of judicial misconduct that may subject a judge to discipline by the commission are described in article VI, section 18, subdivision (d), of the California Constitution. We summarize each of them.
*CJP Supp. 185 1. Willful Misconduct
The most serious form of wrongdoing is willful misconduct, defined as consisting of (1) unjudicial conduct that is (2) committed in bad faith (3) by a judge acting in his or her judicial capacity. (Broadman, supra, 18 Cal.4th at p. 1091; Dodds v. Commission on Judicial Performance (1995) 12 Cal.4th 163, 172 [48 Cal.Rptr.2d 106, 906 P.2d 1260] (Dodds).)
Failure to comply with the California Code of Judicial Ethics is generally considered to constitute unjudicial conduct. (Dodds, supra, 12 Cal.4th at p. 172.)
The “bad faith” requirement for willful misconduct is satisfied when a judge is “(1) performing a judicial act for a corrupt purpose (which is any purpose other than the faithM discharge of judicial duties), or (2) performing a judicial act with knowledge that the act is beyond the judge’s lawful judicial power, or (3) performing a judicial act that exceeds the judge’s lawful power with a conscious disregard for the limits of the judge’s authority.” (Broadman, supra, 18 Cal.4th at p. 1092.) The Supreme Court has described “conscious disregard” in this context as follows: “Because transgressing the limits of a judge’s lawful authority is not the faithful discharge of judicial duties, a judge who performs such acts with no regard at all for whether they are legally permitted cannot be said to be acting with a purpose to faithfully discharge judicial duties. Thus, a judge’s reckless or utter indifference to whether judicial acts being performed exceed the bounds of the judge’s prescribed power is a state of mind properly characterized as bad faith.” (Ibid.)
The “judicial capacity” prong of the willfulness test has been defined as follows: “A judge is acting in a judicial capacity while performing one of the functions, whether adjudicative or administrative in nature, that are associated with the position of a judge or when the judge uses or attempts to use the authority of the judicial office for an improper purpose.” (Broadman, supra, 18 Cal.4th at p. 1104, citing Dodds, supra, 12 Cal.4th at p. 172.)
2. Prejudicial Misconduct
The Supreme Court has defined prejudicial misconduct, the second most serious category of judicial misconduct, as follows: “Prejudicial conduct is distinguishable from willful misconduct in that a judge’s acts may constitute prejudicial conduct even if not committed in a judicial capacity, or, if committed in a judicial capacity, not committed in bad faith. Prejudicial conduct is ‘either “conduct which a judge undertakes in good faith but which nevertheless would appear to an objective observer to be not only unjudicial *CJP Supp. 186 conduct but conduct prejudicial to public esteem for the judicial office” [citation] or “willful misconduct out of office, i.e., unjudicial conduct committed in bad faith by a judge not then acting in a judicial capacity” [citation].’ [Citation.] In this context, bad faith meáns a culpable mental state beyond mere negligence and consisting of either knowing or not caring that the conduct being undertaken is unjudicial and prejudicial to public esteem. In sum, to constitute prejudicial conduct, a judge’s actions must bring ‘the judicial office into disrepute,’ that is, the conduct would appear to an objective observer to be prejudicial to ‘ “public esteem for the judicial office.” ’ [Citation.]” (Broadman, supra, 18 Cal.4th at pp. 1092-1093, original italics.)
3. Improper Action
The least serious type of judicial misconduct is improper action. It consists of conduct that violates the California Code of Judicial Ethics, but that does not rise to the level of prejudicial misconduct. (Rothman, Cal. Jud. Conduct Handbook (2d ed. 1999) § 13.29, pp. 386-387.) Improper conduct includes conduct that an objective observer aware of the circumstances would not deem to have an adverse effect on the reputation of the judiciary. (See Adams v. Commission on Judicial Performance (1995) 10 Cal.4th 866, 897-899 [42 Cal.Rptr.2d 606, 897 P.2d 544].)
III. FINDINGS OF FACT AND CONCLUSIONS OF LAW
The following findings of fact are adopted from the factual findings of the masters, unless otherwise indicated. We find the masters’ factual findings adopted herein to be supported by the record and worthy of deference. (See Fletcher v. Commission on Judicial Performance (1998) 19 Cal.4th 865, 878 [81 Cal.Rptr.2d 58, 968 P.2d 958] (Fletcher) [“special weight” given to the special masters’ factual determinations].) We reach our own legal conclusions based on our independent review of the record and the law. (See ibid.)
A. Count I: Denial of Due Process at Probation Modification Hearings
1. Findings of Fact
a. Common Findings
Each of the eight instances of misconduct charged in count I involves a criminal defendant who appeared before Judge Velasquez to request a modification of the terms of probation; by the end of each proceeding, Judge *CJP Supp. 187 Velasquez found the defendant to be in violation of probation and remanded him to serve a jail sentence in addition to the sentence imposed on the original charge. The defendants were on probation for either driving under the influence (DUI) or public intoxication, and most were requesting more time to complete the requirements of their probation (i.e., AA meetings, installing interlock devices, surrendering to serve time). With the exception of defendant Gonzales (I C), each defendant appeared voluntarily and not by court order. Each defendant arranged to have his case placed on the court’s calendar by filing an application for modification of probation with the clerk’s office. Neither the district attorney nor a defense attorney appeared in any of the cases. The defendants were not advised of their rights, including their right to a formal hearing and counsel, nor did the defendants waive their rights.
Judge Velasquez has handled probation violation matters throughout his 11 years on the bench. He is aware that a defendant cannot be found in violation of probation and sentenced unless he or she either has a formal hearing or waives hearing. In some of the cases in count I, Judge Velasquez was handling more than one calendar and felt under unusual pressure.
Practice of Other Judges in Monterey County
Judge Velasquez testified that when he was a practicing attorney over 11 years ago, he observed other judges in Monterey County handle the probation modification calendar in the same manner—immediately remanding defendants to custody based on a violation of probation without a waiver of rights. The masters found this testimony to be “unconvincing.” We agree and adopt this finding.
In making their factual findings on this issue, the masters also considered the testimony of Linda Chavez, Judge Velasquez’s courtroom clerk. She testified that over the last 18 years she has been a clerk in Monterey County, and that she has seen judges other than Judge Velasquez remand a defendant who appears on the probation modification hearing and impose additional fines for willful failure to comply with the terms and conditions of probation, without an advisement of rights. The masters considered Ms. Chavez to be credible, but found her testimony to be “of only limited significance” since she testified only in generalities and without regard to specific cases, judges or time periods. We concur and adopt this finding as our own.
Based on their evaluation of the testimony on this issue, the masters concluded that the evidence was insufficient to find that other judges in Monterey County either did or did not engage in the same probation modification practices as alleged in count I. In his brief to the commission, *CJP Supp. 188 Judge Velasquez objects to this factual finding and maintains that there was sufficient evidence presented to establish that Judge Velasquez was following the practice of other judges in the county. We have carefully reviewed the evidence submitted on this issue and agree with the finding of the masters.
b. Count IA—People v. Ortega
On March 24, 2004, Adolfo Ortega submitted an application for modification of probation at the clerk’s office. As a condition of his probation, Mr. Ortega had been ordered to either enroll in the work alternative program or surrender to serve five days in jail by January 15, 2004. Having done neither, he requested an extension to enroll in the work alternative program.
On March 26, 2004, Mr. Ortega, without an attorney, appeared before Judge Velasquez on the probation modification calendar. Mr. Ortega told Judge Velasquez that, subsequent to his original surrender date, he had left for a family emergency in Mexico. Judge Velasquez determined that Mr. Ortega had intentionally violated his order to surrender to begin serving his sentence. Mr. Ortega was remanded to serve his sentence. Without advisement or waiver of rights, Judge Velasquez imposed an additional five days of jail for a willful failure to comply with probation.
c. Count IB—People v. Manzo
As a condition of his probation, José Manzo was ordered to either enroll in the work alternative program or surrender to serve five days in jail by May 13, 2004. On July 9, 2004, the court was notified that Mr. Manzo had only completed four of the required 24 hours in the work alternative program.
On July 19, 2004, Mr. Manzo came to the clerk’s office and requested that his case be placed on the modification calendar to request a restricted license. When Mr. Manzo appeared in court on July 30th, unrepresented by counsel, Judge Velasquez questioned him about his failure to complete the work hours. Mr. Manzo referred to information he had from “Jaime.” A business card from Jaime Prieto was in the court file with confusing entries suggesting that Mr. Manzo may have completed up to 18 1/2 hours. Judge Velasquez characterized these entries as “not legitimate” and ordered Mr. Manzo to surrender to serve out the rest of his time. When Mr. Manzo persisted that he had proof from Jaime that he had completed his hours, Judge Velasquez turned the proceedings into an evidentiary hearing. Judge Velasquez left the bench and called the program ex parte. Someone named Ophelia told Judge Velasquez that Mr. Manzo had not completed his hours.
After talking to Ophelia, Judge Velasquez ordered Mr. Manzo to serve 15 additional days in jail for his willful failure to comply with the terms of his probation.
*CJP Supp. 189 Judge Velasquez does not consider the conversation with Ophelia to be an improper ex parte communication. The masters disagreed because the “conversation was held for the purpose of obtaining information that could be used in connection with Mr. Manzo’s court proceedings.” We concur. (See Fletcher, supra, 19 Cal.4th at pp. 896-897 [judge committed misconduct by conducting an ex parte phone conversation from the bench with the park ranger who arrested the defendant for purposes of deciding whether to accept a plea bargain].)
d. Count 1 C—People v. Gonzalez
As a condition of his DUI probation, Guillermo Gonzalez was ordered to attend 30 AA meetings. When he appeared before Judge Velasquez, unrepresented by an attorney, for a review hearing on October 29, 2004, he brought proof of having attended 27 meetings. He explained that work obligations prevented him from attending the remaining three meetings. Judge Velasquez reminded Mr. Gonzalez that he had previously been told that he would receive two days of custody for each AA meeting he did not complete. Without an advisement or waiver of rights, Judge Velasquez found a willful violation of probation and sentenced Mr. Gonzales to six days in jail and 10 additional AA meetings.
e. Count ID—People v. Narez
In October 2004, Sigifredo Narez submitted an application for modification of his DUI probation. The court had previously received information that Mr. Narez had not installed a court-ordered interlock device or shown proof of the 30 AA meetings he was required to attend. On October 29th, Mr. Narez appeared on the probation modification calendar without a lawyer. Mr. Narez explained to Judge Velasquez that the DUI school told him to install the interlock device after completing his DUI classes. Judge Velasquez told Mr. Narez that he would be immediately taken into custody for a willful failure to comply with the court order to install the interlock device.
Then Judge Velasquez asked about the AA meetings. Mr. Narez replied: “I am doing that. I bring some proof here.” Without looking at the AA materials that Mr. Narez offered, Judge Velasquez said: “Did the school tell you not to go to them (the AA meetings)?” As Judge Velasquez was ordering Mr. Narez remanded to custody, Mr. Narez started to say something. Before the interpreter could translate, Judge Velasquez said: “Hold on. . . . You continue to interrupt me, you’ll be at 45 in a hurry.” When Mr. Narez again tried to explain what the school had told him, Judge Velasquez warned: “I told you you’re at 20 days, you insist, you’ll be at 45 and you’ll get to 60 in a hurry.” Judge Velasquez then imposed 20 days in custody for a “willful failure to comply” and ordered Mr. Narez to attend 30 new AA meetings by January.
*CJP Supp. 190 As he was being sentenced, Mr. Narez asked if he could say something. After being granted permission to speak, Mr. Narez attempted to explain that he had been going to AA meetings and already had been given a completion date. Judge Velasquez interrupted him and increased his sentence to 30 days, while warning, “If you’d like to take more of the court’s time, and you’ll be at 60.” When Mr. Narez said that he “just wanted to explain,” Judge Velasquez increased the sentence to 60 days. Mr. Narez started to speak, but before the interpreter could translate, Judge Velasquez increased his sentence to 75 days and threatened to increase the time to 120 days if he continued to speak.
Judge Velasquez was asked at the proceedings before the special masters, “Wasn’t [Mr. Narez] entitled to present evidence and argument that he attended the [AA] meetings?” The judge responded, “That’s what the hearing was for.” Judge Velasquez admitted that he threatened to increase and did increase Mr. Narez’s sentence for trying to offer a defense and for taking up the court’s time.
The masters concluded: “Despite repeated efforts, Mr. Narez was not given any meaningful opportunity to explain his position before Judge Velasquez summarily found him in violation of probation and remanded him. [Citation.] Mr. Narez did not interfere with the court proceedings and at all times was respectful to the court. Judge Velasquez understands that a defendant is entitled to speak and to inquire about sentencing. [Citation.] Judge Velasquez became fully embroiled with the defendant, increasing his time in custody for reasons unrelated to criminal punishment purposes.” We concur.
In his testimony before the special masters, Judge Velasquez acknowledged that he did not handle the matter properly; however, he did not believe that he violated Mr. Narez’s due process rights.
f. Count IE—People v. Nunez
Angel Nunez was placed on DUI probation and ordered to serve 60 days in jail, with a surrender date of October 12, 2004, and to install an interlock device. On October 29, 2004, Mr. Nunez appeared before Judge Velasquez on his application for a new surrender date, unrepresented by counsel. The court had been previously notified that Mr. Nunez had not installed the interlock device as ordered.
When Mr. Nunez appeared, unrepresented, he explained that he had lost the paperwork for his surrender and that his sick child was in court with him. Judge Velasquez gave him a new surrender date and asked if Mr. Nunez had any questions. Mr. Nunez made a general reference to the interlock device *CJP Supp. 191 and, in response to questioning by Judge Velasquez, admitted that it had not been installed. Judge Velasquez ordered Mr. Nunez remanded immediately for failing to surrender, for lying, and “[f]or trying to use his family as a shield.” An additional 30 days was imposed for willful failure to install the interlock device.
The masters found: “Mr. Nunez did not interfere with the court proceedings and at all times was respectful to the court. Judge Velasquez became fully embroiled with the defendant, increasing his time in custody for reasons unrelated to criminal punishment purposes.” We agree.
g. Count IF—People v. Hernandez
As a condition of his probation, Bamabee Hernandez had been ordered to attend 30 AA meetings by December 15, 2004. Mr. Hernandez filed an application for an extension of time to complete his AA meetings. When Mr. Hernandez appeared before Judge Velasquez unrepresented by counsel on December 10, 2004, five days before his December 15th AA completion date, he had attended 16 of the 30 meetings. Mr. Hernandez offered various reasons why he had not completed more meetings. Judge Velasquez stated that he had “little confidence” that the 30 meetings would be completed in the remaining five days.
Mr. Hernandez was immediately remanded to serve three days and ordered to attend 30 AA meetings by January 21st for his willful failure to comply with probation.
h. Count I G—People v. Huitron
On December 10, 2004, Prescilliano Huitron appeared, unrepresented by counsel, before Judge Velasquez on his application for a modification of probation. Mr. Huitron had been ordered to either enroll in the work alternative program or surrender to serve 20 days in jail by November 5, 2004, as a condition of his probation. He failed to do either.
After Mr. Huitron offered his excuse for failing to enroll in the work alternative program, he was immediately remanded to serve the original 20-day sentence, and an additional five days for willful failure to comply with the terms of probation.
At the proceedings before the special masters, Judge Velasquez testified that he believed at the time that he was complying with due process, but now believes that the “best procedure” would be to give an advisement of rights.
*CJP Supp. 192 i. Count IH—People v. Narciso
Donato Narciso was ordered to either enroll in the work alternative program or surrender to serve seven days in jail by November 30, 2004. He failed to do either.
On December 10, 2004, Mr. Narciso appeared, without a lawyer, before Judge Velasquez on his application for a modification of probation and asked for a new program date. Mr. Narciso insisted that he did not understand that he had to surrender for jail if he did not enroll in the work program. Judge Velasquez accused Mr. Narciso of lying and implied that Mr. Narciso was accusing Judge Velasquez of lying. At the conclusion of the hearing, Judge Velasquez remanded Mr. Narciso to serve the original seven-day sentence and imposed an additional three days for violating probation.
2. Conclusions of Law
The masters concluded that Judge Velasquez engaged in willful misconduct in each of the eight cases that comprise count I. We reach the same conclusion.
The masters found, as do we, that Judge Velasquez was conducting probation violation hearings and ordering immediate incarceration “without affording the defendant notice that such a hearing would be taking place and the basis for the alleged violation, and without advising the defendant of his constitutional rights, including the right to counsel and to a formal hearing.” These hearings failed to comply with minimum due process requirements as specified by the California Supreme Court in People v. Vickers (1972) 8 Cal.3d 451, 457-458 [105 Cal.Rptr. 305, 503 P.2d 1313] (Vickers). Before a defendant can be found to be in violation of probation, the defendant has a right to notice of the basis of the alleged probation violation, and a formal hearing which affords an opportunity to cross-examine the witnesses and to present evidence rebutting the allegations. (Ibid.) As observed by the masters, the violations of the defendants’ rights in these cases “were neither minor nor of a technical nature, as in each instance, the defendant was immediately incarcerated.”
In his written briefing before the commission, Judge Velasquez contends that at most his conduct constitutes legal error and, as such, is not subject to discipline under Oberholzer v. Commission on Judicial Performance (1999) 20 Cal.4th 371, 395 [84 Cal.Rptr.2d 466, 975 P.2d 663] (Oberholzer). The California Supreme Court in Oberholzer held that legal error alone does not constitute judicial misconduct subject to discipline. (Id. at pp. 395-398.) However, a judge who commits legal error which, in addition, clearly and *CJP Supp. 193 convincingly reflects “bad faith,” “bias,” “abuse of authority,” “disregard for fundamental rights,” “intentional disregard of the law,” “or any purpose other than the faithful discharge of judicial duty” is subject to sanctions. {Id. at p. 398.)
The masters concluded, as do we, that Judge Velasquez’s actions went well beyond mere legal error; they reflected a disregard of the defendant’s fundamental right to due process. (See Vickers, supra, 8 Cal.3d at p. 457.) As the masters correctly concluded, Judge Velasquez “engaged in intentional conduct that diminished or virtually eliminated those rights.”
In addition, Judge Velasquez acted for a purpose other than the faithful discharge of his duties by becoming embroiled with the defendants, thereby surrendering his role as an impartial jurist. In various cases, Judge Velasquez independently investigated facts, refused to consider documents the defendant had brought to court, engaged in a contest with the defendant to determine who was lying, and increased sentences out of impatience and pique when a defendant attempted to explain his failure to comply with a court order or questioned a sentence. The masters concluded that this “conduct suggests embroilment and abandonment of the role of neutral magistrate.” We agree and adopt this conclusion as our own.
We conclude that Judge Velasquez engaged in unjudicial conduct in a judicial capacity that violated California Code of Judicial Ethics canons 1 and 2A (judge shall uphold integrity of the judiciary, shall comply with the law and avoid impropriety and appearance of impropriety), as well as canons 3B(2) (judge shall maintain professional competence in the law), 3B(4) (judge shall be patient, dignified, and courteous to litigants and others with whom the judge deals in an official capacity), 3B(7) (judge shall accord every person with legal interest in proceeding the full right to be heard and shall not initiate, permit, or consider ex parte communications), and 3B(8) (judge shall dispose of all judicial matters fairly, promptly, and efficiently). (All references to a canon are to the California Code of Judicial Ethics.) This constitutes the first two components of willful misconduct. {Broadman, supra, 18 Cal.4th at p. 1091.)
Judge Velasquez also acted in bad faith, the third element of willful misconduct. {Broadman, supra, 18 Cal.4th at p. 1091.) He acted beyond his lawful authority, either knowingly or with a conscious disregard for the limits of his authority. (Kloepfer v. Commission on Judicial Performance (1989) 49 Cal.3d 826, 849-850 [264 Cal.Rptr. 100, 782 P.2d 239] (Kloepfer) [judge engaged in willful misconduct by accepting guilty plea and admission of a probation violation without an advisement of rights or informing counsel].) We have adopted the masters’ finding that Judge Velasquez is aware that a *CJP Supp. 194 defendant cannot be found in violation of probation and sentenced unless he or she either has a formal hearing or waives hearing. Nevertheless, Judge Velasquez did just that; he sentenced the defendants in count I for being in willful violation of probation without providing the defendants with the opportunity for formal hearing. (See Inquiry Concerning Ross (2005) No. 174, Decision and Order Removing Judge Ross from Office, pp. 32-39 [49 Cal.4th CJP Supp. 79, 112-118] (Ross) [judge committed willful misconduct by finding the defendant had violated the terms of his probation without providing the opportunity for a formal hearing and by proceeding without counsel].)
Additionally, “he acted out of pique, irritation or impatience, any of which is a purpose other than the faithful discharge of his judicial duties” constituting bad faith. (Ross, supra, No. 174 at pp. 17-18 [49 Cal.4th CJP Supp. at p. 100].)
Judge Velasquez maintains that he was acting on the good faith belief that he was following the practices of other judges in Monterey County. We reject this contention for the same reason offered by the masters: “Even if other judges in Monterey County may have on some prior occasions conducted their modification calendars in a similar fashion, or did so when Judge Velasquez was an attorney 11 years ago, this fact does not excuse Judge Velasquez’s behavior; nor does the fact that some attorneys may not have complained.” Judge Velasquez has an obligation to ensure the rights of defendants irrespective of the practices of other judges. (See Kloepfer, supra, 49 Cal.3d at pp. 849-854.)
We also reject Judge Velasquez’s suggestion that he acted on the good faith belief that his practice of incarcerating defendants for violating probation without complying with due process was proper because these were probation modification hearings, as opposed to probation violation hearings. Insofar as the demands of due process are concerned, it makes no difference what the proceedings are called—if in the end the defendant is found in violation of probation and incarcerated, the defendant is entitled, at minimum, to notice and a formal hearing. (Vickers, supra, 8 Cal.3d at pp. 457-458.) Moreover, we have adopted the masters’ factual finding that Judge Velasquez is aware of the difference between violation of probation and modification of probation.
Nor are we persuaded by Judge Velasquez’s suggestion that he was entitled to find the defendant in violation of probation based on the defendant’s factual admission in court. Before a defendant can be found in violation of probation and sentenced based on a factual admission, the defendant must be advised of and make a knowing and intelligent waiver of his or her constitutional rights. (Boykin v. Alabama (1969) 395 U.S. 238 [23 L.Ed.2d *CJP Supp. 195 274, 89 S.Ct. 1709]; In re Tahl (1969) 1 Cal.3d 122 [81 Cal.Rptr. 577, 460 P.2d 449]; Vickers, supra, 8 Cal.3d 451.)
We determine that Judge Velasquez committed willful misconduct in each of the eight cases charged in count I.
B. Count II: Threatening to Increase and Increasing Sentences When Defendants Questioned a Sentence or Otherwise Commented at Sentencing
1. Findings of Fact
a. Common Findings
The masters found: “In each of the cases identified in Count II, Judge Velasquez became embroiled with the defendant at the time of sentencing, and threatened to increase time in custody—and in some instances actually increased time in custody. ... In each instance, Judge Velasquez acted with anger.” We concur and adopt this finding as our own.
b. Count IIA—People v. Merwin
As Judge Velasquez was sentencing Toni Merwin to 10 days in jail on a misdemeanor, Merwin asked “is there a way you can make the time less?” Judge Velasquez responded, “I can make it more.” In the end, Ms. Merwin’s sentence was not increased. The masters found that Judge Velasquez did not like Merwin questioning her sentence (which the judge characterized as “nickel and diming me”) and that his remark was designed to make her stop questioning the sentence and deter others in the courtroom from doing the same. We concur.
c. Count IIB—People v. Gawf
When David Gawf appeared for arraignment, unrepresented by counsel, on a charge of possession of alcohol by a minor, Judge Velasquez offered him the choice of jail or 30 AA meetings, the successful completion of which would result in dismissal of the charges (diversion). Mr. Gawf chose AA meetings. When he asked if the number of AA meetings could be reduced, the judge threatened to take Mr. Gawf s driver’s license and give him jail time instead:
“Defendant: I was—sorry to interrupt you. I was wondering if I can get that reduced even more because I work full time.
*CJP Supp. 196 “Judge: I’ll take your license if you keep talking that way.
“Defendant: Yes, Your Honor.
“Judge: Zero tolerance.
“Female voice: He’s going to dismiss the case if you go to 30 AA meetings.
“Defendant: Oh, okay. Yes, Your Honor.
“Judge: What—how many days in jail do you want?
“Defendant: None, Your Honor.”
At the hearing before the special masters, Judge Velasquez acknowledged that he did not have authority to impose jail time or take Mr. Gawf’s license at that point in the proceedings because the defendant had not pled guilty or been convicted.
d. Count II C—People v. Narez
The factual findings in this case were made in conjunction with count I D.
e. Count IID—People v. Maya
After Erik Maya pled no contest and was sentenced for trespassing, Judge Velasquez asked whether he had paid a $250 fee for public defender services that had been ordered on previous cases.[1] When Mr. Maya offered various reasons why he had not paid the fee, Judge Velasquez suggested he was lying and ordered him to pay the fee by the following Tuesday. When Mr. Maya questioned the date, the judge told him to pay a day earlier. As Mr. Maya again began to speak, Judge Velasquez ordered him immediately remanded into custody. Mr. Maya’s lawyer then spoke with his client and the following exchange occurred:
“DPD [Mr. Maya’s deputy public defender]: Your Honor, he can do it by Monday.
“Judge: Well, you just told me no.
*CJP Supp. 197 “Defendant: Yeah, yeah. I can do it by Monday.
“Judge: How am I supposed to believe in you?
“Defendant: Yeah—
“Judge: You can’t have it—you don’t have the money you told me.
“Defendant: Okay. I do—I’ll find a way to come up with it.
“Judge: Then what were you—then why were you lying to me? Why didn’t you come up with the money when you were supposed to?
“Defendant: Because I didn’t want to go back to my mom and ask her for, to borrow money, she’s been helping me out a lot.
“Judge: Well, then you’re going to be remanded—
“Defendant: But I’ll do that again—
“DPD: Your Honor.
“Defendant: But I’ll do that—I’ll (unintelligible) do it—
“Judge: Excuse me. Mr. Maya, you’re going to be quiet, okay. You were told to pay your fine—your $25 registration fee for a lawyer by a certain date. You chose not to do that. Okay. That was your choice. / just asked you if you could do it by Monday, and you’re there crying like a kid that you can’t do it by Monday. Okay. Until your lawyer butts in and tries to help you and encourages you, all of a sudden you’re creative. I’m talking to you as a man, okay, not as a kid. So you’re going to be remanded. You’ll be released Monday.
“DPD: Your Honor, Your Honor—
“Defendant: My baby’s in the back—
“DPD: Your Honor,—
“Judge: I’m going—okay, you want 30 days? I’ll give you 30 days.
“Defendant: No, I don’t want 30 days.
*CJP Supp. 198 “Judge: Okay. So then you’re going to be remanded to the custody of the sheriffs effective immediately.
“Defendant: But my baby’s in the back—what about my baby?
“Judge: We ’ll get CPS to come and get somebody for you.
“Defendant: Oh, god.
“Judge: Okay.
“Defendant: I have to go to the school today, too, you know, you’ll make me lose all my—
“Judge: Right. Okay. You gotta learn to pay attention.” (Italics added.)
Judge Velasquez eventually agreed to the public defender’s request for an extension to pay the fee until that afternoon, but stated that Mr. Maya would receive an additional 45 days in custody if he failed to pay.
In his testimony before the special masters, Judge Velasquez denied that Mr. Maya’s failure to pay the fee was the basis for his threat to remand Mr. Maya. He claimed that incarceration was threatened as part of the trespass sentence in the case Mr. Maya was appearing on that day. The masters concluded that “[t]his testimony is not credible.” We agree and adopt that finding as our own.
f. Count IIE—People v. Herrero
While being sentenced pursuant to a plea bargain, Modesto Herrero stated that Judge Velasquez had not told him about the $750 fine that was being imposed. Judge Velasquez explained that the fine had been discussed in chambers (apparently in Mr. Herrero’s absence). When Mr. Herrero asked why the fine had to be so high, Judge Velasquez threatened to increase the fine to $2,000. Then, when Mr. Herrero attempted to question Judge Velasquez further about the fine, Judge Velasquez threatened to impose an additional year of jail time. Ultimately, Judge Velasquez did not impose the threatened jail time, but did impose the additional $2,000 fine.
Judge Velasquez testified that he both increased the fine and threatened to increase the jail time because he believed Mr. Herrero was accusing him of not honoring the indicated sentence and calling him a liar. He acknowledged that he did not handle the matter properly and that he owed Mr. Herrero an apology.
*CJP Supp. 199 g. Count IIF—People v. Martinez
As Juan Martinez was being sentenced to 10 days in jail and ordered to pay a fine following his misdemeanor no contest plea, he made bizarre statements that indicated he might have mental problems. When Judge Velasquez asked if he wanted to pay the $250 fine or “serve it out,” Mr. Martinez responded, “I will give you $500.” When Judge Velasquez told him he would “serve out the fine,” the defendant replied “I will give you $500 for being an asshole.” Judge Velasquez then ordered Mr. Martinez to serve 180 days in jail. Mr. Martinez responded by stating “Your Honor, even a month or two—.” Judge Velasquez interrupted: “I’m listening to his comments. I don’t think he’s out of his mind.”
The public defender then requested that the matter be put over for “further evaluation” (apparently referring to a mental evaluation). After the public defender interceded, Judge Velasquez allowed the defendant to withdraw his plea.
Judge Velasquez testified that he threatened to impose 180 days for comments suggestive of contempt of court, but acknowledged that he did not follow contempt procedures.
2. Conclusions of Law
The masters reached different legal conclusions on individual subcounts of count II—finding two instances of willful misconduct, two instances of prejudicial misconduct, one instance of improper action and no misconduct in one instance. We have concluded that Judge Velasquez committed willful misconduct in all of the cases that comprise count II.
In each case, Judge Velasquez threatened to impose jail time, and in some instances actually imposed jail time, in response to a legitimate comment or question from the defendant. In addition, Judge Velasquez admitted he was attempting to discourage the defendant before him and others in the courtroom from questioning their sentences. By so doing, he disregarded the defendant’s right to be heard. Due process affords litigants the right to speak regarding matters which might influence the decisionmaking process. (Dodds, supra, 12 Cal.4th at pp. 176-177.) In addition, a criminal defendant has a statutory right to address the court at sentencing. (Pen. Code, § 1200; In re Shannon B. (1994) 22 Cal.App.4th 1235, 1245 [27 Cal.Rptr.2d 800].)
We are also troubled by the manner in which Judge Velasquez interfered with the defendants’ right to be heard. In every case, with the exception of *CJP Supp. 200 Martinez (who apparently had mental problems), the defendants were respectful to the court and did nothing more than attempt to offer an explanation or ask a legitimate question concerning their sentences. The masters concluded, as do we, that Judge Velasquez responded out of anger and became embroiled with the defendants. As the masters concluded regarding the Maya matter, “rather than acting as a neutral magistrate handling a rather perfunctory fee matter, [Judge Velasquez] vented his anger and flaunted his power in response to what he unreasonably believed to be an attack on his power and authority.” In the Herrero matter, we concur with the masters that Judge Velasquez “became unnecessarily embroiled with the defendant based on his perception that the defendant was essentially accusing Judge Velasquez of lying,” when the defendant was at most honestly confused about the imposition of the second fine. As a result of his inability to maintain a judicial distance and composure in the Narez matter, Judge Velasquez escalated the defendant’s sentence from 20 to 75 days and failed to accept evidence offered by Mr. Narez which may have resolved the question of how many AA meetings he had attended.
By infringing upon the defendants’ right to be heard and becoming embroiled with the defendants, Judge Velasquez violated canons 1, 2A, 3B(4), 3B(7), and 3B(8). Therefore, Judge Velasquez engaged in unjudicial conduct while acting in a judicial capacity.
We also conclude that Judge Velasquez was acting in bad faith. He was performing a judicial act that seriously transgressed his lawful authority by increasing or threatening to increase a sentence when a defendant merely questioned the sentence or offered a defense or explanation in response to an accusation. As an experienced judge, he either knowingly violated or consciously disregarded his obligation to assure those in his courtroom of their right to be heard. Judge Velasquez was also performing a judicial act for the “corrupt purpose” of venting his anger. (See Broadman, supra, 18 Cal.4th at p. 1092; Ross, supra, No. 174 at p. 4 [49 Cal.4th CJP Supp. at p. 88]; Inquiry Concerning Van Voorhis (2003) No. 165, Decision and Order Removing Judge Van Voorhis from Office (2003) pp. 12, 18, 21, 23 [48 Cal.4th CJP Supp. 257, 275, 281, 284, 286] (Van Voorhis) [willful misconduct where judge acted for “corrupt purpose of venting his anger or frustration”].) In addition, in the Maya matter, Judge Velasquez knew or was recklessly indifferent to the law prohibiting incarceration for failure to pay attorney fees. (People v. Amor (1974) 12 Cal.3d 20 [114 Cal.Rptr. 765, 523 P.2d 1173]; see also Kloepfer, supra, 49 Cal.3d at pp. 863-864.) In the Martinez matter, Judge Velasquez was in effect holding the defendant in contempt without following proper contempt procedures, which in itself constitutes bad faith. (Ryan v. Commission on Judicial Performance (1988) 45 Cal.3d 518, 533 [247 Cal.Rptr. 378, 754 P.2d 724]; Cannon v. Commission on Judicial Qualifications (1975) 14 Cal.3d 678, 694 [122 Cal.Rptr. 778, 537 P.2d 898].)
*CJP Supp. 201 In a number of instances, the masters gave deference to mitigating factors in determining that Judge Velasquez did not engage in willful misconduct. For instance, in the Gawf (II B), Herrero (II E), and Martinez (II F) matters, the masters considered that Judge Velasquez did not actually impose the threatened jail time and that he apologized for his conduct in the proceedings before the special masters. We do not consider these factors as being relevant on the issue of bad faith. It is well established that there can be no mitigation for maliciously motivated judicial misconduct. (Kloepfer, supra, 49 Cal.3d at p. 865; Gonzalez v. Commission on Judicial Performance (1983) 33 Cal.3d 359, 377 [188 Cal.Rptr. 880, 657 P.2d 372]; Ross, supra, No. 174 at p. 39 [49 Cal.4th CJP Supp. at pp. 117-118] [fact that judge quickly vacated his bad faith ruling, eliminating any prejudice to the defendant, does not reduce willful misconduct to prejudicial misconduct].) Neither lack of prejudice to the defendant nor a judge’s subsequent corrective action mitigates willful misconduct. (Broadman, supra, 18 Cal.4th at pp. 1095-1096.) With regard to the denial of a criminal defendant’s fundamental rights, the Supreme Court held: “It is immaterial whether [the judge’s] abuse of power resulted in just or unjust treatment for any given defendant. . . . [The judge’s] bad faith was directed towards our legal system itself . . . .” (Geiler v. Commission on Judicial Qualifications, supra, 10 Cal.3d at p. 286.) Thus, Judge Velasquez’s conduct in threatening to impose jail time for offering a defense or questioning a sentence is no less willful because the jail time was never imposed or because he later apologized for his conduct. We conclude that Judge Velasquez engaged in willful misconduct in each instance charged in count II.
C. Count III—Conditioning Sentence on the Defendant’s Response to Whether It Felt Good To “Peel Out”
1. Findings of Fact
a. Common Findings
In each of the five cases that comprise count III, Judge Velasquez asked a defendant who was being sentenced on a misdemeanor charge of exhibition of speed if it “felt good” to “peel out.” The masters found that in each instance Judge Velasquez equated an affirmative answer with taking responsibility for the defendant’s actions, and a negative answer with a failure to accept responsibility. Further, the masters found that “Judge Velasquez to some degree became embroiled in the process, acted in a way that might have suggested he had prejudged the case, and used his own experience as a young man as a factor in the ultimate sentence given.” We adopt these findings and further find, based on our independent review of the record, that Judge Velasquez used his experience as a young man in determining the “correct” answer to the question.
*CJP Supp. 202 b. Count III A—People v. Herrera
After Nicholas Herrera entered a guilty plea to exhibition of speed, Judge Velasquez questioned him concerning whether it felt good to “peel out” in the following exchange:
“Judge: Listen to the question and I want you to be honest. That’s whether you pay $200 or $800 depends on your honesty. When you peel out tires, because that’s what you did, you spin your wheels? Did it feel good?
“Defendant: Did it feel good?
“Judge: Yeah. Yes or no?
“Defendant: Yes.
“Judge: Are you sure?
“Defendant: I mean it didn’t feel good because I was in the water.
“Judge: Well no. The reason for peeling out is because there’s a thrill to it. Right?
“Defendant: Yes.
“Judge: So are you sure it feels good or it doesn’t?
“Defendant: No, it doesn’t feel good.
“Judge: Okay. Now you’re starting to lie.
“Defendant: No, I don’t like it.
“Judge: I do. And if I ever peel out, I do it for a reason. But anyways. You answered straight. This will be your sentence.
“You’ll be placed—and I just questioned you a little more, and then you weakened and went the other way.”
Judge Velasquez imposed a $200 fine and wished the defendant good luck.
c. Count III B—People v. Lopez
Prior to accepting Leonard Lopez’s plea to exhibition of speed, Judge Velasquez informed him that his fine would be between $200 and $1,000 *CJP Supp. 203 “depending on your answer.” After Mr. Lopez pled guilty, Judge Velasquez asked him “does it feel good” to peel out. When the defendant replied “no,” Judge Velasquez accused him of lying. As Mr. Lopez began to speak, Judge Velasquez interrupted: “I didn’t ask you if it was an accident, I just asked you a straightforward question. When we do that stuff, and I’ve done it, you peel out, you’re just—you’re showing off. You do it for a reason. Some girls are passing by, you wanted to get their attention.”
When Judge Velasquez again asked Mr. Lopez if it felt good, Mr. Lopez replied “not when you get pulled over.” Judge Velasquez imposed a fine of $800.
d. Count III C—People v. Lynch
Aaron Lynch was told that he would be fined between $200 and $1,000 depending on his answer to the question of whether it felt good to “peel out.” When the defendant answered “yes,” Judge Velasquez imposed a $200 fine and told Mr. Lynch “[tjhat’s the answer I wanted.”
e. Count III D—People v. Lopez, Jr.
Joe Lopez, Jr., answered “yes” when Judge Velasquez asked him if it felt good to peel out. Judge Velasquez responded: “That’s why we do it.”
f. Count III E—People v. Martinez
At sentencing Judge Velasquez said to Samuel Martinez: “When you do it [peel out], whether by accident or by mistake or because you don’t know— you’re familiar with the truck—the vehicle. But when it happens does it feel good?” When Mr. Martinez replied “yes,” Judge Velasquez said, “That’s why we do it, right? . . . That’s why we do it sometimes—to show off?”
2. Conclusions of Law
The masters concluded that accusing the defendants in the Herrera (III A) and Lopez (III B) matters of lying was improper action, but otherwise found no misconduct in count HI. We, however, determine that Judge Velasquez engaged in prejudicial misconduct in each of the five cases in count HI.
In the proceedings before the special masters, Judge Velasquez maintained that determining whether a defendant is willing to “own up” to having intentionally engaged in exhibition of speed is within his sentencing discretion. Whether a defendant accepts responsibility for committing the offense is a proper factor for a judge to take into consideration in sentencing. *CJP Supp. 204 However, whether it feels good to “peel out” does not equate with accepting responsibility for the offense of exhibition of speed. The offense does not include a requirement that the defendant “feel good.” (Veh. Code, § 23109, subd. (a).)
Moreover, the record reflects that Judge Velasquez was not really concerned with whether the defendants were accepting responsibility for intentionally committing the offense, but with whether they would admit that it felt good. When Leonard Lopez tried to explain that his peeling out was an accident, Judge Velasquez responded: “I didn’t ask you if it was an accident, I just asked you a straightforward question.” Similarly, Judge Velasquez told Samuel Martinez that it did not matter whether he peeled out by accident or by mistake, the only question was whether it felt good.
The record further reflects that Judge Velasquez made prejudgments regarding the defendant’s credibility based on his own personal experiences as a young man. We conclude that Judge Velasquez violated canons 1, 2A, 3B(4), and 3B(8) by becoming embroiled with the defendants, unreasonably accusing some defendants of lying, and acting in a way that manifested prejudgment.
Judge Velasquez’s conduct was prejudicial to public esteem for the judiciary. His questions turned the proceedings into a game show with the defendant attempting to guess the correct answer in order to obtain the lower fine. As Special Master Provost put it during argument, “[D]on’t you think, though, the perception of the public was that this was a setup?” Additionally, Judge Velasquez detracted from the dignity of the proceedings by announcing in court that he has engaged in the same criminal conduct as the defendant. As such, we determine that Judge Velasquez engaged in five instances of prejudicial misconduct in count HI.
D. Count IV: Giving Defendants the Choice of Diversion or Jail Time, Without Advisement of the Right To Plead Not Guilty and, In Some Cases, Suggesting That the Consequence of Failure to Successfully Complete Diversion Was Immediate Incarceration
1. Findings of Fact
In each of the seven cases in count IV, the defendant appeared for arraignment on misdemeanor alcohol or marijuana charges. Before each case was called individually, Judge Velasquez gave a mass advisement of constitutional rights to those seated in the courtroom that included the right to plead not guilty and go to trial. However, when the defendants appeared before the judge individually, Judge Velasquez presented them with a choice of diversion (attending AA meetings after which the charges would be dismissed) or *CJP Supp. 205 jail time. (“Would you like to go to jail or go to 30 AA meetings?” (count IV A, Gawf); “Do you want to plead guilty or do you want to go to 20 AA meetings?” (count IV B, Guerrero).) Judge Velasquez did not tell them that they had the option of pleading not guilty and having a trial. Further, although the consequence of failing to successfully complete the AA meetings (diversion) is resumption of the proceedings, including the right to a trial, in certain cases the judge told the defendants they would go to jail. (“Don’t come back short of the meetings because then the deal is off and you’ll go to jail.” (Count IV D, McEwan.))
The masters found that Judge Velasquez “did not appear to understand that his statements suggested to the defendants that the adverse consequences would be automatically imposed on the defendants if they failed to complete the AA meetings, even though they had not entered a plea.” We agree.
2. Conclusions of Law
The masters concluded that in each of the seven cases, Judge Velasquez engaged in prejudicial misconduct. We reach the same conclusion. Judge Velasquez’s conduct interfered with the defendants’ exercise of one of the most basic and important of constitutional rights, the right to jury trial. As stated by the masters: “When the individual case was called, defendant was given a Hobson-like choice that did not include the right to plead not guilty and have a trial. Rather than ensuring constitutional rights, which Judge Velasquez was obliged to do (see Kloepfer, supra, 49 Cal.3d 826, 850-851), Judge Velasquez created an environment in which the full exercise of those rights was unlikely.”
Judge Velasquez violated canons 1, 2A, and 3B(7). As Judge Velasquez concedes, his conduct in each instance in count IV constitutes prejudicial misconduct.
E. Count V: Issuance of Bench Warrants When the Defendant Was Not Legally Required To Appear and Ordering Attorney To Produce Letter Related to Judge Velasquez’s Disqualification
1. Findings of Fact
a. Common Findings
In seven of the eight cases in count V (in one case, count V B, no evidence was presented), the defendants had authorized counsel to appear for them in misdemeanor proceedings pursuant to Penal Code section 977 (section 977). That section authorizes an attorney to appear on the defendant’s behalf in *CJP Supp. 206 misdemeanor cases and excuses the defendant from appearing. When neither the attorney nor the defendant appeared for a scheduled appearance, Judge Velasquez issued a bench warrant for the defendant’s arrest.
In his testimony before the masters, Judge Velasquez insisted that he was legally entitled to issue the warrants because a lawyer has a responsibility to be present or inform the court of his or her absence. He denied that his actions had the effect of punishing the defendants for their attorney’s conduct. When asked whether he considered sanctioning the lawyer instead of issuing a warrant for the defendant, Judge Velasquez responded that he has never sanctioned a lawyer.
b. Count V A—People v. Kitchen
Attorney Shawn Mills represented Douglas Kitchen. On the date set for a plea “without the defendant’s presence,” there was no response when the case was called at 9:03 a.m. on the 8:15 a.m. calendar. Judge Velasquez understood that the defendant was not expected to be present, but nevertheless issued a $15,000 bench warrant for the defendant’s arrest.
A few minutes after the warrant issued, Mr. Mills can be heard on the tape asking Judge Velasquez to call his case. Judge Velasquez neither called the case nor informed Mr. Mills that a warrant had been issued for his client’s arrest. Later during a recess, Mr. Mills spoke to the judge and the prosecutor in chambers regarding a condition of Mr. Kitchen’s probation—again, the judge did not tell Mr. Mills that he had issued a warrant.
When court resumed, Mr. Mills waited for his case to be called. As the court started to take another recess approximately 25 minutes later, Mr. Mills inquired about why his case had not been called. At that point, Judge Velasquez informed him that a warrant had been issued. Mr. Mills explained that he had been delayed in another courtroom, but had been in Judge Velasquez’s courtroom five times that morning to see if his case had been called. Judge Velasquez refused to recall the warrant and told Mr. Mills “it isn’t, not my responsibility to baby-sit attorneys’ offices or manage their calendars.”
Mr. Mills wrote the judge a letter later that day, noting that the bailiff had seen him several times that day and that he had once told the bailiff he was in another department. He asked that his client not be punished for his actions. The next day, Judge Velasquez recalled the warrant.
c. Count V C—People v. Hoffman
Judge Velasquez issued a warrant for Scott Hoffman when he missed his arraignment. Attorney Peter Leeming wrote the calendar clerk and explained *CJP Supp. 207 that Mr. Hoffman had not received notice of the arraignment because he had moved. Mr. Leeming requested that the matter be set for November 17, 2004. When Judge Velasquez called the case on November 17, neither the attorney nor the defendant was present—the clerk had apparently failed to inform Mr. Leeming that his request had been granted. Judge Velasquez knew from Mr. Leeming’s letter that Mr. Leeming intended to appear on Mr. Hoffman’s behalf and the defendant would not be present. Another attorney in court offered to appear on Mr. Leeming’s behalf. Judge Velasquez refused the request and issued a $15,000 warrant for the defendant (having recalled the original $6,000 warrant).
The next day Attorney George Gigarjian wrote Judge Velasquez and explained that he was handling Mr. Leeming’s cases while he was out of town and that Mr. Leeming had not been informed of the November 17 date. Judge Velasquez denied Mr. Gigarjian’s request to withdraw the warrant.
On December 7, 2004, Mr. Gigarjian spoke to Judge Velasquez regarding the warrant, but again the judge refused to withdraw the warrant. The defendant filed a peremptory challenge against Judge Velasquez and the case was reassigned. On December 20, 2004, Presiding Judge Sillman ordered the warrant recalled.
d. Count V D—People v. Holt
Attorney Shawn Mills represented Dustin Holt. When neither appeared at a pretrial hearing, Judge Velasquez issued a $15,000 warrant for the defendant’s arrest.
A week later, Mr. Mills wrote Judge Velasquez and explained that he had mistakenly set the matter for a different date and asked that the warrant be withdrawn. He explained that Mr. Holt was in the military and could be charged with AWOL if he surrendered or was arrested on the warrant. Judge Velasquez made handwritten comments on the letter including, “As an attorney, you have an obligation to represent your client effectively. Your lack of responsibility is your own fault.” The letter with the comments was placed in the file but not sent to Mr. Mills. Judge Velasquez denied the request to recall the warrant and Mr. Holt was arrested on the warrant.
e. Count V E—People v. Holder
Attorney Mills also represented Ronald Holder. When neither appeared at the pretrial conference, Judge Velasquez issued a $15,000 warrant for the defendant’s arrest. The next day, Mr. Mills wrote to the court clerk and asked *CJP Supp. 208 that the matter be recalendared. Judge Velasquez denied the request. Mr. Holder was arrested on the warrant.
f. Count V F—People v. Huggins
Attorney Frank Dice represented Demetrious Huggins. When neither appeared at a scheduled court appearance on January 5, 2005, Judge Velasquez issued a bench warrant for the defendant.
On February 7, 2005, Mr. Dice sent a letter to the Monterey County Superior Court in which he explained that he had missed the court date because of a failure in the office calendaring system. He said that his attempts to have the matter recalendared had not been processed. Mr. Dice stated that Mr. Huggins’s case did not fall within any of the provisions of Penal Code section 978.5, which specifies when warrants may be issued, and attached a copy of the statute. The letter further stated, “Sanctions under Civil Code are appropriate . . . against counsel, [f] Mr. Huggins should not suffer because counsel missed a court appearance.”
Judge Velasquez reset the matter and recalled the bench warrant. However, Mr. Dice failed to appear again at a subsequent court appearance and another warrant was issued. At Attorney Dice’s request, the matter was recalendared and the warrant was recalled.
g. Count V G—People v. Huerta/People v. Kammer
Attorney Steve Liner was appearing for the defendants Huerta and Kammer. The record does not reflect whether Mr. Liner had previously appeared for either defendant or whether a section 977 authorization was noted in the court file.
When the calendar was first called in the morning, Mr. Liner asked that his two cases be called but did not identify them by name. Judge Velasquez responded “just a minute,” and called another case. When Judge Velasquez called the Huerta and Kammer matters, there was no appearance and bench warrants were issued for each defendant.
When Mr. Liner returned to the courtroom, he reminded Judge Velasquez that he had been in court earlier that morning and that Judge Velasquez had “refused to call my case.” Judge Velasquez told Mr. Liner that he did not want to put Mr. Liner’s cases “in front of other people,” because “[yjou’re nothing special.” Judge Velasquez further informed Mr. Liner that it was his responsibility to “come here on time” and if he did not “that’s your problem.”
*CJP Supp. 209 The same day, Judge Velasquez was disqualified pursuant to an affidavit of disqualification under Code of Civil Procedure section 170.6. Also, on the same day, the presiding judge recalled the warrants for defendants Huerta and Kammer.
Over three weeks later, Attorney Steve Liner appeared before Judge Velasquez on an unrelated matter. By this time, Judge Velasquez knew he had been disqualified in the Kammer and Huerta matters. Despite that, he mentioned the cases by name and demanded that Mr. Liner provide him with copies of letters of complaint that Mr. Liner had submitted to the presiding judge. He told Mr. Liner that he expected the letters by 5:00 p.m. that day. Judge Velasquez also warned Mr. Liner, “[i]f [the letters] are incorrect, you will be dealing with the Bar . . . .”
Judge Velasquez acknowledged that he was not aware of any authority that permitted him to order production of the letters.
h. Count V H—People v. Gonzalez
Miguel Gonzalez’s case was placed on the court’s calendar at his public defender’s (DPD) request to ask for a re-referral to a court-ordered program; a warrant had previously been issued for failure to enroll in the program. The DPD was not present when the case was called because she thought it was on a later calendar. Judge Velasquez was told that the DPD would be right back and he fully expected that she would return, as she was the assigned public defender in his courtroom. Nevertheless, he issued a warrant for the defendant’s arrest.
Later that morning, the DPD asked about the Gonzalez warrant and told the judge that she thought the matter was on later in the morning. Judge Velasquez knew that the DPD wanted him to recall the warrant, but it was not recalled until over two months later.
2. Conclusions of Law
The masters concluded that Judge Velasquez did not commit misconduct in issuing the warrants, but did engage in misconduct in failing to recall them when he learned that the failure to appear was the result of the attorney’s mistake and not the client’s. We conclude that Judge Velasquez engaged in willful misconduct both by issuing the warrants when he knew that the defendants were not present because they were proceeding under section 977 and by subsequently refusing to recall the warrants upon the attorneys’ requests. We further determine that Judge Velasquez engaged in willful misconduct by ordering an attorney to produce letters that had been submitted *CJP Supp. 210 to the presiding judge when Judge Velasquez knew that he had been disqualified in the cases that were the subject of the letters.
Issuing Bench Warrants
In his briefs to the commission, Judge Velasquez maintained that his conduct in issuing the warrants constitutes at most legal error citing Oberholzer, supra, 20 Cal.4th 371. In his oral presentation before the commission, Judge Velasquez conceded that he had improperly penalized defendants for their attorney’s failure to appear. We conclude that Judge Velasquez manifested a callous indifference to the bounds of his authority by issuing bench warrants for defendants when he knew they were not required to appear, and did so for the improper purpose of teaching the defendants’ attorneys a lesson. The judge’s misconduct resulted in the incarceration of at least two defendants in violation of due process.
The masters made a factual finding, which we have adopted, that in each of the cases “the defendant had authorized counsel to appear for him” pursuant to section 977. Section 977 provides that a misdemeanor defendant may “appear by counsel only,” except in specified circumstances that are not applicable here. This section “confers upon a defendant in a misdemeanor proceeding a ‘statutory right to be absent under the Penal Code.’ ” (Simmons v. Superior Court (1988) 203 Cal.App.3d 71, 76 [249 Cal.Rptr. 721], quoting People v. Kriss (1979) 96 Cal.App.3d 913, 916 [158 Cal.Rptr. 420]; see Olney v. Municipal Court (1982) 133 Cal.App.3d 455, 459 [184 Cal.Rptr. 78].)
Penal Code section 978.5, subdivision (a), provides that a bench warrant may be issued whenever a defendant “fails to appear in court as required by law” (italics added). Since a misdemeanor defendant who has authorized an attorney to appear on his or her behalf is not required to appear {ibid.), a warrant cannot issue. Section 978.5 sets forth a nonexclusive list of circumstances where a bench warrant may issue, none of which applies in these cases. In Kloepfer, supra, 49 Cal.3d at page 851, the judge’s removal was based in part on issuing a warrant for a misdemeanor defendant when counsel represented that he was appearing on the defendant’s behalf. The Supreme Court stated: “Issuance of the warrant was proper only if the defendant had been ordered to appear and failed to do so. (See Pen. Code, § 978.5.)” {Ibid.) As we stated in the public admonishment of Judge Stephen Gildner, “[n]o reasonable or reasonably competent judge would assume or conclude” that a bench warrant could be issued when the defendant had not been ordered *CJP Supp. 211 to appear or otherwise been given notice that his or her appearance was required. (In re Gildner (2005) Decision and Order Imposing Public Admonishment, p. 4.)[2]
Issuance of the warrants constitutes more than mere legal error under Oberholzer, supra, 20 Cal.4th at page 398. Judge Velasquez disregarded the defendant’s fundamental due process right to notice and seriously undermined the attorney-client relationship. In addition, he abused his authority and acted in bad faith with utter and conscious disregard for the limits of his authority by issuing warrants for defendants who were not required to appear. (Broadman, supra, 18 Cal.4th at p. 1092.) Further, he was performing a judicial act for a purpose other than the faithful discharge of his duties—to punish errant lawyers. (See Ross, supra, No. 174 at pp. 17-18, 32 [49 Cal.4th CJP Supp. at pp. 100, 111]; Van Voorhis, supra, No. 165 at pp. 9, 11, 18 [48 Cal.4th CJP Supp. at pp. 271, 273-274, 280-281].)
In each of these cases, there is clear and convincing evidence that Judge Velasquez knew at the time he issued thé warrant that the failure to appear was the fault of the attorney and not the defendant. In the proceedings before the special masters, Judge Velasquez testified: “I was issuing a warrant because that defendant’s lawyer was not present.” The appropriate remedy would have been to sanction the lawyer, rather than penalizing the defendant by issuing a bench warrant.
We conclude that the judge’s conduct in issuing the warrants violated canons 1, 2A, 3B(2), 3B(4), 3B(7) and 3B(8). Having determined that Judge Velasquez performed these judicial acts in bad faith (with conscious disregard for the limits of his authority and for a corrupt purpose), we conclude that he engaged in willful misconduct with regard to the issuance of the bench warrants in counts V A (Kitchen), V C (Hoffman), V D (Holt), V E (Holder), and V F (Huggins).
The misconduct in issuing the warrant was exacerbated by Judge Velasquez’s refusal to withdraw the warrant when the lawyer subsequently explained his absence and requested that the warrant be withdrawn. The handwritten note on Mr. Mill’s letter in the Holt matter admonishing the attorney’s “lack *CJP Supp. 212 of responsibility” manifests the extent to which Judge Velasquez became embroiled with the attorneys. Punishing a defendant for the actions of his or her attorney is callous and punitive.
There is not clear and convincing evidence that Judge Velasquez was aware that the defendants in the Huerta and Kammer (count V G) matters were proceeding under section 977 at the time he issued the warrants. As such, we conclude that there is no misconduct in the issuance of the warrants in those cases. However, Judge Velasquez did commit willful misconduct in refusing to recall the warrant when Attorney Liner arrived later that morning. Further, as we explain next, Judge Velasquez’s subsequent actions in those cases constitute additional willful misconduct.
Ordering Attorney to Produce Letters
The masters found that Judge Velasquez ordered Attorney Liner to deliver the letters to him when he “had no authority to make such an order, as he was disqualified from acting in the only case to which those letters had any arguable relevance.” This conduct, the masters concluded, violated Code of Civil Procedure section 170.4 (which delineates the power of a disqualified judge) and canons 1, 2A, 3B(2) and 3B(4). We concur and adopt these findings and conclusions as our own. However, we decline to adopt the legal conclusion of the masters that this conduct constitutes only improper action; instead, we conclude that it constitutes willful misconduct..
It is well established that a judge is prohibited from taking any further action in a case once disqualified, including questioning or criticizing the attorney who filed an affidavit of disqualification. (McCartney v. Commission on Judicial Qualifications (1974) 12 Cal.3d 512, 531-532 [116 Cal.Rptr. 260, 526 P.2d 268]; Inquiry Concerning Hall, No. 175, Decision and Order Removing Judge Hall from Office (2006) p. 22 [49 Cal.4th CJP Supp. 146, 167] (Hall).) Moreover, a judge is expected to know the proper procedure for handling a motion to disqualify. (Spruance v. Commission on Judicial Qualifications (1975) 13 Cal.3d 778, 797 [119 Cal.Rptr. 841, 532 P.2d 1209].) Judge Velasquez knew he had been disqualified in the case and conceded that he was not aware of any authority that permitted him to order Mr. Liner to produce the letters. As such, he acted with knowledge of, or a conscious disregard for, the limits of his authority.
Finally, Judge Velasquez not only exceeded his authority, but did so to pursue a personal interest in proving that Mr. Liner had lied to the presiding judge about the events in the Huerta and Kammer matters. As such, he was performing a judicial act for a purpose other than the faithful discharge of his *CJP Supp. 213 judicial duties, providing a further basis for our conclusion that he acted in bad faith. (See Ross, supra, No. 174 at pp. 17-18 [49 Cal.4th CJP Supp. at pp. 99-100].)
F. Count VI: Inappropriate Humor and Disparaging Remarks
1. Findings of Fact
In the 14 instances charged in count VI, Judge Velasquez is alleged to have made inappropriate comments in the courtroom, including joking about imposing jail time and disparaging attorneys. We reach the following findings of fact from our own independent review of the record.
The following are the judge’s “jokes” about imposing jail time:
Count VI A, People v. Martinez: In response to the defendant’s asking if he could work off the fine, Judge Velasquez said: “I wasn’t going to give you any jail time, but if you want some, I’ll give you some. How many days would you like? You have 180 to pick from.”
Count VI B, People v. Oksen: In response to the defendant’s asking if he could do home confinement instead of 10 days’ jail, Judge Velasquez said, “I’ll give you a full year if you want it.”
Count VI C, People v. Lutz: In response to the defendant’s asking if he had to worry about the warrant that had just been recalled, Judge Velasquez said: “Unless, you want us to execute it?”
Count VI D, People v. McGill: In response to the defendant’s asking if jail time would be imposed, Judge Velasquez said: “If you want some, I’ll give you some.”
Count VI E, People v. Flores: In response to the defendant’s asking a question about his fine, Judge Velasquez said: “Would you like some jail?”
Count VI G, People v. Lainez: At sentencing, Judge Velasquez said to the defendant: “You’re only going to be locked up for one year unless you want two years, I’ll give them to you. Do you want one year or two?”
Count VI H, People v. Kadjevich: While looking through the files of Mr. Kadjevich’s old cases, Judge Velasquez pretended to find information that the defendant “owed” 35 days of jail time on a previous case. When the defendant objected that he had already served that time, Judge Velasquez *CJP Supp. 214 said: “No, but new—new—new days, 35 new days.” Eventually, Judge Velasquez told the defendant that he was “[j]ust kidding.”
Count VI I, People v. Hildago: When the defendant’s friend appeared for the defendant, Judge Velasquez asked who he was and then said: “Okay. We’ll take you to jail. Come on in. No, I’m kidding.”
Count VI J, People v. Narez: The defendant pled guilty after having been advised that he would not be sentenced to jail time. During sentencing, Judge Velasquez said: “Were you taken to jail at all? . . . [Wjould you like to be taken to jail?”
Count VI K, People v. McDonald: The defendant asked if he could say something after being told that he would be “put away” for a full year if he did not come back to court with $5,000 in child support. Judge Velasquez replied: “Before you go to jail for the full year or after?”
Count VI L, People v. James: A defendant who appeared to have mental problems, asked the judge if he had watched the presidential debate where the president “overturned the weapon charge and suggested that I pack a sidearm.” Judge Velasquez asked him if that was “on cable or on local?”
Count VI M, People v. Lopez: After the defendant tried to correct the judge’s pronunciation of his first name, Judge Velasquez said: “Oh, the minutes says Leonard. Leonardo is the one that’s going to jail. Leonard is staying home. [j[] Which do you prefer? . . . I’m just kidding.”
The following are the judge’s remarks disparaging attorneys:
Count VI F, People v. Bowen: After the defendant’s attorney made a two-and-a-half-minute plea that his client not be incarcerated, Judge Velasquez responded, “Let me wake up.”
Count VI N, People v. LeBow: The defendant appeared without her attorney who had allegedly failed to file proof of acknowledgment of the terms of probation. After asking the name of the attorney, Judge Velasquez said in a crowded courtroom, “[Tjhis is the second case he blows it for his client.” Later, the judge said: “You can bill him at $300 bucks an hour, charge him two hours.”
2. Conclusions of Law
We conclude that Judge Velasquez engaged in prejudicial misconduct in each instance charged in count VI, except subcount L, James. Having adopted *CJP Supp. 215 the masters’ finding that the judge’s comment about “cable or local” television in the James matter may have been intended to appease a defendant who apparently had mental problems, we conclude that there is not clear and convincing evidence of misconduct in that instance.
“Joking” About Incarceration
The authority vested in the judiciary to incarcerate individuals carries with it a solemn responsibility that should never be taken lightly. A judge must be sensitive to the anxiety inherently associated with the possibility of serving time in custody. Judge Velasquez contends that he was attempting in good faith to interject humor into the courtroom. We fail to see how suggesting that a person is going to be incarcerated can ever be considered appropriate humor in the courtroom. Judge Velasquez was not trying to motivate the defendants to accept responsibility or succeed at probation—he was joking at the expense of the defendants and a person who appeared in court only as a favor to a friend.
The people to whom Judge Velasquez addressed his jail comments were being respectful and appropriate and were often asking legitimate questions about their sentences. The fact that some of the judge’s remarks were brief does not make them any less offensive or inappropriate. The comments most likely caused stress and concern to the defendants, even if for a brief moment. With regard to the remark to the defendant’s friend in Hildago, the masters correctly observe that Judge Velasquez “appeared to have no appreciation for what may have been an anxious situation for the friend who may have been unfamiliar with the court system . . . .” In addition, Judge Velasquez’s attempts at humor in a public courtroom under the circumstances were undignified, out of place, and prejudicial to public esteem for the judiciary. As such, the remarks violated canons 1, 2A, and 3B(4), and constitute prejudicial misconduct.
Disparaging Remarks Regarding Attorneys
Disparaging and demeaning comments addressed to attorneys in open court have repeatedly been considered indicative of a lack of appropriate judicial temperament. (Van Voorhis, supra, No. 165 at pp. 5-23 [48 Cal.4th CJP Supp. at pp. 267-286]; Fletcher, supra, 19 Cal.4th at pp. 879-880; Kennick v. Commission on Judicial Performance (1990) 50 Cal.3d 297, 326-327 [267 Cal.Rptr. 293, 787 P.2d 591]; Kloepfer, supra, 49 Cal.3d at pp. 841-844, 849.) Such comments are inappropriate irrespective of the judge’s personal opinion of the attorney’s competence. (Van Voorhis, No. 165 at pp. 5-23 [48 Cal.4th CJP Supp. at pp. 267-286]; Fletcher, at pp. 879-880; Kennick, at pp. 326-327; Kloepfer, at pp. 841-844, 849.) As the *CJP Supp. 216 masters concluded: “Belittling an attorney violates the ethical obligation in Canon 3B(4) to be dignified and courteous to all persons who come before the court, expressly attorneys. When inappropriate conduct occurs in front of the attorney’s client, it may actually interfere with the attorney-client relationship.”
As the masters observed, in Bowen, the defendant’s attorney was making “a passionate but reasonable plea that his client, who was suffering from a disabling disease, not be placed in custody, even if the client herself had intimated otherwise.” Judge Velasquez’s response, “Let me wake up,” was rude and disrespectful in violation of canons 1, 2A, and 3B(4). Judge Velasquez violated these same canons by questioning the competence of defendant LeBow’s attorney in a crowded courtroom. We conclude that it would appear to an objective observer that the judge’s comments in both the Bowen and LeBow matters were prejudicial to public esteem for the judicial office and as such constitute prejudicial misconduct.
We also note that Judge Velasquez’s 1997 censure was based in part on essentially the same conduct—making “public statements disparaging fellow Monterey County judges and certain Monterey County attorneys.”
G. Count VII: Allowing His Children in the Bench Area and in Chambers While Conducting Court Business
In light of our conclusions in counts I through VI, we take no action with respect to count VII.
IV. DISCIPLINE
A. Standards for Determining Appropriate Discipline
In making our determination of the appropriate disciplinary sanction, we consider that the purpose of a judicial disciplinary proceeding is not punishment, “ ‘but rather the protection of the public, the enforcement of rigorous standards of judicial conduct, and the maintenance of public confidence in the integrity and independence of the judicial system.’ ” (Broadman, supra, 18 Cal.4th at p. 1112, quoting Adams v. Commission on Judicial Performance, supra, 10 Cal.4th at p. 912.) Based on Supreme Court decisions, the commission has identified various factors that are relevant in determining the appropriate discipline, including (1) the number of acts of misconduct; (2) the existence of prior discipline; (3) whether the judge appreciates the inappropriateness of his or her conduct; (4) the judge’s integrity; (5) the likelihood of future misconduct; and (6) the impact on the *CJP Supp. 217 judicial system. (Ross, supra, No. 174 at pp. 63-64 [49 Cal.4th CJP Supp. at pp. 137-138]; Van Voorhis, supra, No. 165 atp. 31 [48 Cal.4th CJP Supp. at p. 295].)
1. Number of Acts of Misconduct
By Judge Velasquez’s own admission, he has engaged in numerous instances of serious misconduct. We have determined Judge Velasquez engaged in 21 instances of willful misconduct and 25 instances of prejudicial misconduct—a plethora of misconduct by any standard. In addition, the misconduct is wide ranging in both nature and impact. It was directed toward criminal defendants, attorneys, and even a person who appeared in court as a favor for a friend who was having difficulty making his court appearance.
The Supreme Court has stated: “The number of wrongful acts is relevant to determining whether they were merely isolated occurrences or, instead, part of a course of conduct establishing ‘lack of temperament and ability to perform judicial functions in an even-handed manner.’ [Citation.]” (Fletcher, supra, 19 Cal.4th at p. 918, quoting Wenger v. Commission on Judicial Performance (1981) 29 Cal.3d 615, 653 [175 Cal.Rptr. 420, 630 P.2d 954].) The record before us demonstrates a disturbing and persistent pattern of misconduct that not only reflects a lack of judicial temperament, but utterly fails to comply with “the standards of judicial conduct that are essential if justice is to be meted out in every case.” (Kloepfer, supra, 49 Cal.3d at p. 866, original italics.)
2. Prior Discipline
Judge Velasquez has already been censured, the most serious form of discipline short of removal available to the commission. The 1997 censure was based on the following misconduct: (1) displaying a crucifix on the wall behind the bench; (2) authorizing a private group to use his name with his judicial title in a newspaper advertisement endorsing one side in the ongoing abortion debate; (3) creating an appearance of prejudgment by publicly announcing a policy of imposing a specific predetermined sentence in all DUI cases; and (4) making statements in court, in newspapers, and on television broadcasts disparaging fellow Monterey County judges and certain attorneys, including accusing attorneys of incompetence and fellow judges of racism and conspiring to “manipulate” his calendar and make him “look bad.” (Inquiry Concerning Velasquez (1997) No. 139, Decision and Order Imposing Public Censure.)
The commission’s decision not to remove Judge Velasquez in 1997 was based in part on the fact that “prior to the time that formal proceedings were *CJP Supp. 218 instituted by the Commission, and throughout the past year, Judge Velasquez had refrained from further misconduct.” Judge Velasquez’s efforts at reform were short lived; he has since continued to engage in serious misconduct, some very similar to the conduct that led to his censure.
In addition to the prior censure, Judge Velasquez received an advisory letter in April 2006 for addressing defendants directly in Spanish regarding matters of substance in violation of Code of Civil Procedure section 185, subdivision (a) which provides that all judicial proceedings are to be conducted in English.
Given the entirety of his disciplinary history and the misconduct at issue here, a second censure is .clearly insufficient. It also would be contrary to the commission’s “established policy and practice of escalating discipline for successive misconduct.” (Hall, supra, No. 175 at p. 23 [49 Cal.4th CJP Supp. at p. 168].)
3. Appreciation of Misconduct
“A judge’s failure to appreciate or admit to the impropriety of his or her acts indicates a lack of capacity to reform.” (Inquiry Concerning Platt (2003) No. 162, Decision and Order Removing Judge Platt from Office, p. 15 [48 Cal.4th CJP Supp. 227, 248]; see Ross, supra, No. 174 at p. 65 [49 Cal.4th CJP Supp. at p. 139].) In his appearance before the commission, Judge Velasquez orally assured the commission that he has learned from his past experiences and will refrain from engaging in future misconduct. However, his responses to the charges throughout these proceedings suggest otherwise. Judge Velasquez rarely displayed any recognition or understanding of the ethical and legal principles underlying the misconduct. Moreover, in many instances he has completely denied any wrongdoing.
In his testimony before the masters, Judge Velasquez conceded that he did not always handle the probation violation proceedings in count I properly, but denied that his procedures violated the defendants’ due process rights. Even in the face of these charges, he failed to acknowledge the serious constitutional defects in his practice.
Judge Velasquez testified that he thought it was proper to tell defendants they would go to jail if they did not successfully complete diversion by attending AA meetings because jail could be imposed if they were later convicted. As the masters observed, he “did not appear to understand that his statements suggested to the defendants that the adverse consequences would be automatically imposed on the defendants if they failed to complete the AA meetings even though they had not entered a plea.”
*CJP Supp. 219 In his testimony before the special masters, Judge Velasquez compared “joking” about sending a defendant to jail with the injection of appropriate and good-natured humor during jury selection. There is no comparison between the two situations. Further, he fails to recognize that in the cases before the commission it was the nature of the joke that was inappropriate.
Regarding the ex parte phone call he made to a witness in the Manzo matter (count I B), Judge Velasquez testified that he did nothing wrong, because, “I’m trying to find the truth.” This statement reflects a serious lack of understanding of basic due process principles, including the right to confront and cross-examine a witness. It also manifests his failure to appreciate that the boundaries of his judicial role prohibit him from engaging in private investigation of material facts of a pending case.
Judge Velasquez offered numerous other justifications and excuses for his conduct as noted in our factual findings. Special Master Justice Rubin aptly observed: “It did seem to me that there was a theme throughout the proceedings that . . . Judge Velasquez did not always articulate—at least did not seem to appreciate in his own mind what he was doing with respect to some of these actions. Calling it penalty, increasing jail time, in really contemptuous situations without using contempt, going from modification to probation violation in a kind of seamless way.” Judge Velasquez’s repeated failure to grasp the substance or seriousness of his misconduct leaves us with no confidence in his capacity to reform.
4. Integrity
Integrity as it relates to a determination of the appropriate discipline has generally focused on honesty. (Ross, supra, No. 174 at pp. 68-69 [49 Cal.4th CJP Supp. at pp. 141-142]; Inquiry Concerning Hyde (2003) No. 166, Decision and Order Removing Judge Hyde from Office, pp. 29-30 [48 Cal.4th CJP Supp. 329, 366-367].) In this case, the misconduct itself does not involve dishonesty. However, Judge Velasquez was less than candid in his testimony before the special masters regarding one of the charges. He attempted to deflect responsibility for his misconduct in count IID (Maya) by falsely testifying that he threatened to impose jail time as part of the defendant’s sentence for the underlying offense of trespass. The record, however, establishes that the threatened jail time was for the defendant’s failure to pay attorney fees, which was patently improper.
5. Likelihood of Future Misconduct
Judge Velasquez’s repetition of misconduct after being publicly censured, and his unwillingness or inability to appreciate the principles *CJP Supp. 220 underlying his current misconduct combine to lead us to the conclusion that there is a very strong likelihood, if not a certainty, of future misconduct if he is not removed. His repeated failure to comply with basic due process requirements and well-established legal authority after 11 years on the bench in a criminal assignment leaves us with no reasonable assurance that more time and the best of intentions would prevent future misconduct. Further, we concur with the following assessment by the masters: “The breadth of the previous and current misconduct suggests to us that Judge Velasquez does not appreciate the limits of his authority and the unique role a judge plays in our system of government.”
Judge Velasquez points to the testimony of Attorney Lawrence Biegel as evidence of his capacity to reform. Mr. Biegel testified that he and the judge have recreated a professional relationship after Mr. Biegel was the target of disparaging remarks that were included in Judge Velasquez’s 1997 censure. He also offered his opinion that Judge Velasquez has grown as a jurist. We reach the opposite conclusion. Despite having been censured for publicly accusing Mr. Biegel of malpractice, Judge Velasquez again engaged in the exact same conduct directed at a different attorney in LeBow.
6. Impact on Judicial System
A pattern of misconduct reflecting abuse of authority and serious infringement of criminal defendants’ constitutional rights necessarily has a negative impact on the judicial system. Such misconduct undermines the integrity of and respect for the judiciary and weakens the constitutional foundation of our system of justice. We are dismayed by the capricious and often callous manner in which Judge Velasquez treated criminal defendants and others who appeared before him. He manifested a blatant disrespect for the constitutional rights he has sworn to uphold by increasing sentences when a defendant dared to ask an appropriate and respectful question, incarcerating defendants without notice or a hearing, and issuing bench warrants for defendants when he knew they were not required to appear. Additionally, he set an undignified tone in his courtroom that demeaned the judiciary by quizzing defendants about how it felt to “peel out” based on his own youthful indiscretion, using humor inappropriately, and disparaging counsel and defendants.
B. Mitigating Evidence
Judge Velasquez presented evidence in mitigation consisting of testimony and declarations from character witnesses. For the most part, these witnesses testified to the judge’s positive contributions to the community outside of his judicial capacity and his reputation as a role model in the Latino community. *CJP Supp. 221 Four Monterey County attorneys testified that they have found Judge Velasquez to be hard working, courteous, and appropriate in court. There is no evidence that any of the character witnesses were present in Judge Velasquez’s court when any of the misconduct occurred.
We take this character evidence into account in considering “the totality of the circumstances that are pertinent to our determination of the appropriate discipline.” (Adams v. Commission on Judicial Performance, supra, 10 Cal.4th at p. 912; see Kloepfer, supra, 49 Cal.3d at pp. 865-866; Ross, supra, No. 174 at p. 71 [49 Cal.4th CJP Supp. at p. 144].) The contributions Judge Velasquez has made to the community are laudable. We are also mindful of the challenges Judge Velasquez has faced in life as the son of migrant farmworkers. Nevertheless, these considerations are overwhelmed by the breadth and severity of the judge’s past and present misconduct. Members of the community who appear before Judge Velasquez inside the courtroom are entitled to the same respect and dignity he accords those who consider him to be a role model outside the courtroom.
C. Order Removing Judge Velasquez From Office
Judge Velasquez urges the commission to impose a second censure rather than removal. Another censure would be woefully inadequate to address the egregious and persistent pattern of misconduct before us. Conscientious discharge of our duty to protect the public and maintain public confidence in the integrity and independence of the judiciary mandates that we remove Judge Velasquez from office.
Pursuant to the provisions of article VI, section 18 of the California Constitution, Judge José A. Velasquez hereby is ordered removed from his judicial office; pursuant to that section of the Constitution and rules 120(a) and 136 of the Rules of the Commission on Judicial Performance, Judge Velasquez is disqualified from acting as a judge.
Commission members Hon. Frederick P. Horn, Hon. Judith D. McConnell, Hon. Katherine Feinstein, Mr. Marshall B. Grossman, Mr. Michael A. Kahn, Ms. Patricia Miller, Mr. Jose C. Miramontes, Ms. Barbara Schraeger, and Mr. Lawrence Simi voted in favor of all the findings and conclusions expressed herein and in the foregoing order of removal and disqualification of Judge Velasquez. There are two vacancies on the commission.
*CJP Supp. 222 The judge’s petition for review by the Supreme Court was denied on October 10, 2007.

A defendant can be ordered to pay a fee for the services of a public defender (Pen. Code, § 987.5, subd. (a)), but cannot be incarcerated for failure to pay the fee—it is only enforceable as a civil judgment {People v. Amor (1974) 12 Cal.3d 20 [114 Cal.Rptr. 765, 523 P.2d 1173]).

 The masters concluded that the law on this issue is “not so settled” based on dictum from one sentence in Beasley v. Municipal Court (1973) 32 Cal.App.3d 1020, 1026 [108 Cal.Rptr. 637], which suggested that a bench warrant may issue when a defendant, who does not appear for trial and is represented by counsel, “appears neither in person nor by counsel.” We conclude that this dictum does not undermine well-established legal precedent that issuance of a bench warrant is only proper when an absent defendant is required by law to appear and has been provided notice. (Ibid.; People v. Ranger Ins. Co. (1992) 6 Cal.App.4th 1301, 1304 [8 Cal.Rptr.2d 464]; Kloepfer, supra, 49 Cal.3d at p. 851; Pen. Code, § 978.5.)